BURKE *v*. NEW ENGLAND NATIONAL BANK.

Opinion delivered January 14, 1918.

1. FRAUDULENT CONVEYANCES—TO MEMBERS OF FAMILY.—A voluntary conveyance of property by an embarrassed debtor, to members of his family, is fraudulent as to existing creditors.

2. FRAUDULENT CONVEYANCES—INSOLVENT DEBTOR—GOOD FAITH.— There is no rule of law contravening the right of an insolvent debtor to borrow money and pledge his property in good faith, for the purpose of paying his debts.

3. INSOLVENCY—SUBSTITUTION OF ASSETS.—The *bona fide* substitution of one asset for another equally valuable, by an insolvent debtor, can not prejudice a creditor.

Appeal from Sebastian Chancery Court, Fort Smith District; *W. A. Falconer,* Chancellor; reversed in part; affirmed in part.

——————

*Hill, Fitzhugh & Brizzolara* and *John H. Vaughan,* for appellants.

1.  M. C. Burke was not insolvent at the time of the alleged trasfer and there is no evidence of fraud, actual or constructive.

2.  All the property transferred to the Union Realty Company, as well as other property held to be fraudulently conveyed was bought with the funds of Burke Bros.

3.  Lot 3, block 45 Fitzgerald's Addition did not belong to M. C. Burke. But he was solvent at the time of the conveyance. It was bought with funds of Burke Bros. and really belonged to J. A. Burke. Burke Bros. were indebted to Mary Burke. There was no fraud on creditors. Lots 7 and 8, block 9, S. Fort Smith were worth little. They were also bought with funds of Burke Bros and the transfer to Helene Burke could not be fraudulent as to one half of the property. Burke was solvent at the time and there was no fraud nor intent to defraud creditors.

4.  The assignment and transfer of the corporate stock was legal. There was a valuable consideration and no fraud. Burke was not insolvent, even if embarassed. The transfers were pledges to secure valid debts.

5.  Both the stock and land cannot be taken. The law as applied to the facts is stated in 73 Ark. 174; 86 *Id.* 225; 91 *Id.* 394; 108 *Id.* 164. Burke was solvent. An insolvent husband may prefer his wife's debt. 76 Ark. 254; 119 *Id.* 492. Mere inadequacy of price does not indicate fraud. 118 *Id.* 229. But here the consideration was adequate. Each pledge was for the actual amount of money advanced. There was no withdrawal of property from creditors, the money was used to pay creditors. 50 Ark. 314; 107 *Id.* 588. See also, 96 Ark. 531; 101 *Id.* 573.

*Kimpel & Daily,* for appellees.

1.  The evidence supports the findings of the chancellor. All the facts and circumstances point to and show

that the conveyances and transfers were voluntary and fraudulent as to creditors. 68 Ark. 167; 73 *Id.* 174; 86 *Id.* 225; 106 *Id.* 252; 179 S. W. 329; 116 Ark. 686; 107 *Id.* 537; 110 *Id.* 335 and others. Burke was insolvent before any of these conveyances and transfers were made and the considerations were not valid.

2. The conveyance to his daughter Helene was voluntary and fraudulent. There is no evidence that J. A. Burke was interested in the lots or that it was purchased with funds of Burke Bros. Nor did Helene pay anything for the property.

3. The deed to Mary Burke was also void. She paid no consideration for the lot. It was a pure gift from an insolvent and void as to creditors.

4. The conveyance of the old opera house property and the transfer of 349 shares of stock by M. C. Burke to his wife and sister were void. No consideration was paid and the transfers fraudulent.

5. The conveyance of the opera house property to Union Realty Company was fraudulent and void. There was no consideration. The chancellor's findings are supported by the evidence.

6. The pledge of Burke's stock to members of his family and his various corporations were fraudulent and void. No satisfactory explanation of any of these transfers was made by Burke. All the facts and circumstances point to and indicate fraud. 110 Ark. 347.

HUMPHREYS, J. Appellees, judgment creditors of M. C. Burke, filed suit in the chancery court in the Ft. Smith district of Sebastian County, against appellants, to cancel as voluntary and fraudulent various conveyances of real estate and many assignments and pledges of stocks made by M. C. Burke to his co-appellants.

All the appellants answered denying that the conveyances of real estate and assignments and pledges of stocks were voluntary and fraudulent.

The causes were consolidated and heard upon the pleadings, oral and record evidence, and a decree rendered

canceling as voluntary and fraudulent the assignment of 349 shares of the corporate stock in the Union Trust & Realty Company to Alice and Mary Burke; the pledges of 50 shares of said stock to each of the following parties: Alice Burke, Mary Burke, A. J. Burke, Burke Brick Company and Union Trust & Realty Company; and the following conveyances of real estate: An undivided one-half interest in the west 67 feet of lot 4, south side of Garrison Avenue, and lot 10 in block 505 in the Reserve Addition, known as the Opera House property, to Union Trust & Realty Company; lot 3, block 45, in Fitzgerald's Addition to the city of Ft. Smith, to Mary Burke; and lots 7 and 8 in block 9, in South Ft. Smith, to Helene Burke.

From the decree canceling assignments and pledges of stocks and conveyances of real estate aforesaid, an appeal has been lodged in this court.

The record is so voluminous the court is impelled to confine itself to a general statement of the facts in substance only.

M. C. Burke was a wealthy business man and during his years of prosperity gave his wife and other relatives quite a little property. In the year 1905 he and his brother, A. J. Burke, conveyed real estate in the town of Cotter, Arkansas, to Alice, his wife, and Mary, their sister, of the value of $5,000. Prior to any financial trouble, he erected buildings on that portion of the Cotter property conveyed to his wife, which enhanced its value from $2,500 to $12,500. Through such gifts, and judicious investments thereof, Alice Burke acquired a considerable separate estate of money, stocks and real estate, prior to the acquisition of the property subjected to the payment of her husband's debts by the decree in this case.

M. C. Burke was a man of large affairs, and, for the purpose of carrying on his business, incorporated the Burke Brick Company, Burke-Andrus Sand Company, Union Trust & Realty Company, and organized the partnership of Burke Bros., Burke & Josephs, Burke & McNerney and Burke Construction Company. The corpora-

tions engaged in business indicated by their respective names and the partnerships in the construction of municipal improvements, railroads and other contract work of like nature. While operating these corporations and firms, M. C. Burke and A. J. Burke acquired real estate of considerable value, which was paid for chiefly with partnership and joint corporate funds. The Union Trust & Realty Company was organized in the year 1910 initially as a holding corporation for the real estate of the Burke family, with an authorized capital stock of $200,000, but only $100,000 was treated as paid-up and subject to issue. The $100,000 of stock was apportioned, 599 shares to M. C. Burke, 400 shares to A. J. Burke, and 1 share to their attorney, John Vaughan, for incorporation purposes. The stock was not actually issued and delivered, but was treated as apportioned and issued in the manner aforesaid until January, 1913. At the time the corporation was organized, it was understood that stock would be issued at a future date to each according to the value of the real estate conveyed to the corporation by each. The Burke family conveyed real estate to it when first organized as a basis for the stock issued for the expressed value in the deeds of about $60,000. Some of it was more valuable than the expressed consideration; for example, Alice Burke conveyed lots in Cotter of the value of $12,500 for an expressed consideration of only $2,400. M. C. Burke and John Vaughan both testified that it was the intention of M. C. Burke and A. J. Burke to convey the opera house property to the Union Trust & Realty Company as a basis for the $100,000 stock issue, but the minutes of the corporation show that the corporation refused to accept the property, and the reports of the officers, from time to time, prior to January, 1913, corroborate the books. Other property in addition to the opera house, owned by the Burkes, was not conveyed to the corporation.

Prior to the year 1912, M. C. Burke inaugurated the policy of borrowing from one corporation or firm to assist some other corporation or firm in which he was

interested. It became necessary to assist the firms of Burke & Josephs and Burke & McNerny, so M. C. Burke, without the knowledge or consent of his brother, withdrew $65,000 from the firm of Burke Bros, for that purpose. On September 3, 1912, in order to indemnify his brother against loss on account of the withdrawal of funds from Burke Bros. in the past and future, he assigned his brother 600 shares of Burke Brick Company stock, 83 shares of Burke-Andrus Sand Company stock, and an undivided one-half interest in Burke-Andrus Sand Company, purchased from W. P. Andrus; an undivided one-half interest in all moneys and open accounts due Burke Bros., and all retained percentage on contract with Improvement District No. 5, City of Ft. Smith, and all moneys that might become due on final completion of their paving contract with the City of Ft. Smith; and his undivided one-half interest in machinery, the constructions, moneys, etc., in Burke-Cochran Construction Company of Lincoln, Nebraska, and in the Burke & McNerny contracts and outfits.

On January 1, 1913, the financial condition of M. C. Burke was about as follows: He owned 800 or 900 shares of Burke Brick Company stock, pledged to the Central National Bank of St. Louis and his brother for large amounts. This stock was later sold for a trifle. 123 shares of the stock of Burke-Andrus Sand Company, pledged to his brother to secure a large amount; 150 shares in a Texas land company, pledged to H. P. Hilliard of the Central National Bank; cash in banks, $1,100; open accounts $1,200; an undivided one-half interest in the opera house property upon which there was a $20,000 mortgage; lot 3, block 45, Fitzgerald's Addition which he afterwards claimed belonged to his brother; and 599 shares of stock in the Union Trust & Realty Company, 24 shares of which rightfully belonged to Mary Burke, and 125 shares of which rightfully belonged to Alice Burke, under a former agreement to equitably divide the stock.

On the 29th day of January, 1913, M. C. Burke and A. J. Burke conveyed the opera house property to the Union Trust & Realty Company for the consideration of $1. On the same day, he conveyed lot 3, block 45, Fitzgerald's Addition to the City of Ft. Smith, to Mary Burke for an expressed consideration of $1,500, but no consideration was really paid. Lot 3, block 45 was pur- chased from Mary McKenzie, et al, in 1909. This lot was purchased along with lots 1 and 2 in the same block for the joint consideration of $4,600, $500 of which amount was paid by M. C. Burke and the balance by Burke Bros. Lots 1 and 2 were conveyed to A. J. Burke and lot 3 to M. C. Burke. Lot 4, 5 and 6 in the same block were purchased in 1908 from a different party for $4,500 and conveyed to Alice Burke. On the same day, he assigned 250 shares of the corporate stock of the Union Trust & Realty Company to Alice Burke, his wife, 125 shares of which was a gift; and 99 shares to Mary Burke, his sister, 75 shares of which was a gift. Alice Burke had only conveyed real estate of the value of $12,500 to the corporation and Mary Burke lands of the value of $2,400.

In the execution of his designs to borrow money to tide his weak corporations over the chasm of financial distress, M. C. Burke pledged 50 shares of the corporate stock of the Union Trust & Realty Company on the 3rd day of January, 1913, to A. J. Burke, to secure borrowed money in the sum of $5,700; 50 shares on the 16th day of January, 1913 to Alice Burke, to secure borrowed money in the sum of $5,000; 50 shares on February 4, 1913, to Union Trust & Realty Company to secure bor- rowed money in the sum of $5,200; 50 shares pledged on the 1st day of May, 1913, to Burke Brick Company to secure borrowed money in the sum of $5,000; 50 shares pledged on the 30th day of May, 1913, to Mary Burke to secure borrowed money in the sum of $3,000.

Checks were issued by the respective parties afore- said to M. C. Burke for money borrowed by him, and he executed notes to each for the amounts borrowed and attached the stock certificates to each note.

The New England National Bank obtained its judgment on the 8th day of October, 1914, on an indebtedness for $7,500, the major portion of which had existed since August 12, 1912. Leming Company obtained judgment on the 23d day of June, 1914, for $1,272 on an indebtedness, a portion of which existed as far back as June 3rd, 1912. Jefferson Trust Company obtained judgment on the 23d day of June, 1914, for $7,125 on an indebtedness created on or about the 13th day of May, 1914. Before executions were issued upon the judgments the transfers of the corporate stock aforesaid by M. C. Burke were deposited in the county clerk's office. The deed of the opera house property to the Union Trust & Realty Company was filed for record on the 23rd day of October, 1914. The deed for lot 3, block 45, Fitzgerald's Addition to Mary A. Burke was filed for record on February 26th, 1915. On the same date, a deed was placed of record from M. C. Burke to his daughter, Helene Burke, to lots 7 and 8, block 9, South Ft. Smith, Arkansas, which had been executed on January 23, 1914, for a consideration of $200 and love and affection. The last mentioned property was purchased by M. C. Burke with private funds and conveyed to his daughter without consideration other than love and affection.

It is admitted by learned counsel for appellant that if M. C. Burke was insolvent at the time he made the transfers of stocks and real estate that they were void as to existing creditors, if made without fair consideration. The transfers challenged by the appellees and canceled by the court began in the month of January, 1913, and ended with the transfer of the South Ft. Smith lots to Helene Burke, January, 23, 1914. The conveyance of real estate, transfers and pledges of stock made by M. C. Burke to members of his family during the month of January, 1913, and thereafter, practically stripped him of all his material assets except equities which were of doubtful value. It is quite apparent from the record that M. C. Burke was on doubtful ground financially as far back as 1912. At that time he had been forced to draw as much as $65,000 out of the copartnership assets of Burke Bros., to assist his weaker concerns which were in financial distress, and at

that early date had pledged nearly all his personal property to indemnify his brother against loss. The statement he introduced in evidence as to his financial condition on January 31, 1913, consisted in estimated equities in stocks which he had pledged for large amounts, either to banks, his own corporations or relatives. He was forced to allow these equities to sell at a later period for a mere trifle. By his own admission, he was cramped financially after November, 1913, and was insolvent when the judgments were obtained against him. Owing to the complex business relations of M. C. Burke, it is hard to determine the exact date he became insolvent, but, after a careful investigation of the record, we are convinced that, aside from the property he afterwards conveyed, assigned and pledged to his relatives and the Union Trust & Realty Company, he was insolvent as early as January 1, 1913. Having determintd that M. C. Burke was an embarrassed debtor in January, 1913, and it appearing that all of the conveyances canceled by the trial court were made to Burke's own corporations or near relatives, the main issue is thereby narrowed to the sole question of whether the conveyances were without consideration. The rule in this character of case, as applied to voluntary conveyances, has been clearly stated and is as follows:

(1) "Conveyances made to members of the household and near relatives of any embarrassed debtor, are looked upon with suspicion and scrutinized with care, and, when they are voluntary, they are *prima facie* fraudulent, and when the embarrassment of the debtor proceeds to financial wreck, they are presumed conclusively to be fraudulent as to existing creditors." *Wilks* v. *Vaughan,* 73 Ark. 174; *McConnell* v. *Hopkins,* 86 Ark. 225; *Morgan* v. *Kendrick,* 91 Ark. 394-399; *Simon* v. *Reynolds-Davis Grocery Co.,* 108 Ark. 164.

The conveyance of an undivided one-half interest in the opera house property to the Union Trust & Realty Company was for an expressed consideration of $1 and therefore voluntary, unless in equity it should be treated as conveyed to the holding corporation when the Burkes

conveyed the other property to it.  If so treated, a part
of the stock apportioned to the Burkes would constitute
the consideration for the property and the conveyance
would not be voluntary.  It is insisted that the value of
the property actually conveyed to the corporation did not
warrant an issue of $100,000 in stock and that, therefore,
the opera house property was necessarily the basis of the
$100,000 stock issue.  This contention is not conclusive
for it is not an uncommon thing to over-value real estate
when made the basis of a stock issue, even though con-
trary to the Constitution of Arkansas.  Again, it may be
that the real estate actually conveyed to the corporation
was of the value of $100,000, for it is in evidence that the
Cotter property conveyed to the corporation by Mrs. Alice
Burke was conveyed on the basis of the value of the land,
exclusive of improvements.  That particular land was
worth only $2,400 and the improvements $10,000.  The
property, including the improvements, passed to the cor-
poration by the deed.  This tract of land would warrant
an issue of $12,500 in stock, when if the expressed consid-
eration in the deed were the criterion, this tract would
warrant an issue of only $2,400 in stock.  The record is
silent as to improvements on the other tracts conveyed to
the corporation.  The records of the corporation show
that the corporation refused to accept the opera house
property by resolution.  Immediately after refusing to
accept the property, $100,000 of stock was treated as
issued and apportioned.  According to the report of the
officers a year later, the opera house property was not
included as a part of the real estate belonging to the cor-
poration.  It is also in evidence that immediately after
the corporation refused to receive the opera house prop-
erty from M. C. Burke that M. C. Burke deeded an un-
divided one-half interest therein to his brother, A. J.
Burke.  The explanation tendered, that the failure to
deed the property to the corporation was an oversight, is
neither reasonable nor satisfactory.  The chancellor cor-
rectly held the conveyance of date January 29, 1913, of

the opera house property to the Union Trust & Realty Company for $1, a voluntary conveyance and void.

The conveyance of lots 7 and 8, block 9, in South Fort Smith, by M. C. Burke to Helene Burke, his daughter, was without consideration and made at a time when M. C. Burke was insolvent, and the finding of the chancellor to the effect that it was voluntary and void is approved.

It is insisted that the court erred in holding the conveyance of lot 3, block 45, in Fitzgerald's addition, to Mary Burke, a voluntary conveyance by M. C. Burke, for the reason, it is said, that the lot was the property of A. J. Burke, and not M. C. Burke's. This lot was purchased along with lots 1 and 2 in the same block for a total consideration of $4,600. Burke Bros. paid $4,100 of the purchase money and M. C. Burke $500 thereof. Lots 1 and 2 were deeded to A. J. Burke and lot 3 to M. C. Burke by the same grantors at the same time. Lot 3 was valued in the deed at $1,500, so the division made at the time between M. C. Burke and A. J. Burke was most favorable to A. J. Burke. It is said, however, that because lots 4, 5 and 6 in the same block were purchased with Burke Bros.' money and conveyed to Alice Burke, that lots 1, 2 and 3 equitably belonged to A. J. Burke. Lots 4, 5 and 6 were purchased from a different party a year before lots 1, 2 and 3 were purchased. These were entirely different transactions, and, as far as the record reflects, no connection existed between the two purchases. The explanation offered that this lot belonged to A. J. Burke, and not M. C. Burke, is unreasonable in the light of the testimony in this case. The chancellor was correct in holding that the conveyance was voluntary and void.

It is insisted by appellant that the chancellor erred in finding that the assignment of 250 shares of stock in the Union Trust & Realty Company to Alice Burke was voluntary and void. We think it clearly established by the evidence that Alice Burke conveyed separate real estate to the holding corporation of the value of $12,500 with the understanding that she should receive therefor stock

of the corporation in equal amount. It is equally as clear that M. C. Burke not only assigned $12,500 of said stock to her but that he made her a present of an additional $12,500 of said stock. The chancellor was correct in finding the assignment of 125 shares of said stock voluntary and void, but was in error in so holding as to the other 125 shares assigned.

A like error was committed as to twenty-four shares assigned to Mary Burke, but the chancellor was correct in holding that seventy-five shares assigned to Mary Burke was voluntary and void. Mary Burke had conveyed real estate to the corporation of the value of $2,400 and was entitled to that amount in stock under the general agreement entered into when the holding corporation was organized.

(2-3) Again, it is contended that the chancellor erred in holding the pledges of stock in the total amount of 250 shares to A. J. Burke, Alice Burke, Mary Burke, Burke Brick Company and Union Trust & Realty Company, for borrowed money, voluntary and void. We think it clearly established by the evidence that M. C. Burke borrowed the money in these several instances for the purpose of paying his creditors and that he paid the money to his creditors. It was in keeping with his plan and practice. Notwithstanding his extended financial entanglement, he had faith and hope in his ability to extricate himself from his dilemma. There is no rule of law contravening the right of an insolvent debtor to borrow and pledge his property in good faith for the purpose of paying his debts. The stock pledged by M. C. Burke was not withdrawn from the reach of his creditors. The money obtained on it was applied to the payment of his debts and his creditors still have the right to subject his equities in the stock to the payment of their judgments. The *bona fide* substitution of one asset for another equally valuable by an insolvent debtor can not prejudice a creditor. We think a clear preponderance of the evidence reflects the fact that M. C. Burke borrowed the amount of

money claimed, from each of the parties for the purpose of paying his creditors, and that he pledged the stock in good faith to secure the loans. The chancellor was in error in holding otherwise.

Lastly, it is contended that the creditors can not subject both stock in the Union Trust & Realty Company and the interest of M. C. Burke in the opera house property, which it is contended constituted a basis for the $100,000 issue of stock in that corporation. Their contention would be correct if the opera house property constituted the basis for the stock issue, but we have held otherwise.

The decree is affirmed in directing a cancellation of the deeds conveying the opera house property, lot 3, block 45, Fitzgerald's addition, lots 7 and 8, block 9 south, Fort Smith; and the assignment of 125 shares of stock in the Union Trust & Realty Company to Alice Burke, and seventy-five shares thereof to Mary Burke—but is reversed in directing a cancellation of an additional 125 shares of stock in the Union Trust & Realty Company to Alice Burke and twenty-four shares thereof to Mary Burke, and in directing a cancellation of the pledges of stock to A. J. Burke, Alice Burke, Mary Burke, Union Trust & Realty Company and Burke Brick Company for borrowed money, and the cause is remanded with directions to enter decree in accordance with this opinion.

HUMPHREYS, J., (on rehearing). It is insisted on motion for rehearing that the division of the stock in the Union Trust & Realty Company, made on January 29, 1913, is the criterion by which the real interest of M. C. Burke and A. J. Burke in the stock should be ascertained.

The court did not treat the final stock issue of stock in the Union Trust & Realty Company, on January 29, 1913, of 250 shares of stock, each, to M. C. Burke, A. J. Burke, Alice Burke and Mary Burke, as representing a correct division or apportionment between them according to the original understanding that each should receive stock in proportion to the value of the lands conveyed by each to the holding corporation. On the contrary, the

court treated M. C. Burke as the owner of 599 shares of stock in said corporation, and A. J. Burke as the owner of 400 shares therein, subject, of course, to the equitable right of Alice and Mary Burke to have an amount equal to the value of lands conveyed by each to the corporation. The value of the lands conveyed by Alice was $12,500, and by Mary, $2,400. Alice was entitled to 125 shares and Mary twenty-four shares. M. C. Burke disposed of all his stock by gift or assignment. He does not claim to be the owner of any stock clear of encumbrance at this time. The following disposition was made of the 599 shares owned by him:

Two hundred and fifty shares assigned as collateral security; 125 shares assigned to Alice Burke in exchange for real estate; 125 shares assigned to Alice Burke by way of gift; 24 shares assigned to Mary Burke in exchange for real estate; 75 shares assigned to Alice Burke by way of gift. It is quite clear that this disposition was made of the 599 shares from the fact that A. J. Burke had 400 shares in the beginning, and now claims only 250 shares. It follows that he only gave Mary Burke 150 shares of his stock.

The mere fact that all the real estate was originally bought with partnership money is not conclusive that M. C. and A. J. Burke owned the lands equally when they were conveyed to the holding corporation. M. C. Burke conveyed much more land to the corporation than A. J. Burke. The fact that the stock was issued to them in unequal proportion indicates that they were not equal partners in all the land. They acted upon the original division made by them too long, and under the solemnity of an oath too often, to now say that a portion of the M. C. Burke stock belonged to A. J. Burke.

The court held that the opera house property was not rightfully conveyed to the Union Trust & Realty Company and that it never constituted the basis of a stock issue or added value to the stock. The original property conveyed by the parties constituted the basis and gave value to the $100,000 stock issue.

Upon further examination of the transcript, it is found that the property conveyed to the holding corporation by Mary Burke was valued at $2,500, instead of $2,400, as found in the original opinion.

The original opinion is therefore modified so as to cancel seventy-four shares of the Mary Burke stock, instead of seventy-five shares.

In other particulars the motion for rehearing is overruled.